# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

Kansas Association for the Medically
Underserved,

Plaintiff,

v.                                             Case No. 2017cv4005-DDC-KGG

Health Metric Systems, Inc.,

Defendant.

## <u>PRETRIAL ORDER</u>

A pretrial conference was scheduled in this case for February 6, 2018.   A

proposed pretrial order was presented on February 5, 2018.  After consultation, counsel

agreed that no conference was required.  The plaintiff, Kansas Association for the

Medically Underinsured, appeared through counsel, Charles T. Engel and Derek D.

Ulrich of Engel Law, P.A., Topeka, Kansas.  The defendant, Health Metric Systems, Inc.,

appeared through counsel, Patrick A. Hamilton, Lenexa, Kansas.

This pretrial order supersedes all pleadings and controls the subsequent course of

this case.  It will not be modified except by consent of the parties and the court's

approval, or by order of the court to prevent manifest injustice.  Fed. R. Civ. P. 16(d) &

(e); D. Kan. Rule 16.2(b).

## 1.      PRELIMINARY MATTERS.

Subject-matter jurisdiction, personal jurisdiction and venue are not disputed.
No motion has been timely filed under the court's scheduling orders.

1

**a.      Subject-Matter Jurisdiction.**  Subject-matter jurisdiction is invoked under 28 U.S.C.§ 1332 and is not disputed.

**b.      Personal Jurisdiction.**  The court's personal jurisdiction over the parties is not disputed.

**c.      Venue.**  Venue in this court is not disputed.

**d.      Governing Law.**  Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by the following law of the state of California.

**2.      STIPULATIONS.**

**a.**      The following facts are stipulated:

   None.

**b.**      The parties have stipulated to the admissibility of the following exhibits for purposes of trial:

   None.

**3.      FACTUAL CONTENTIONS.**

**a.      Contentions of Plaintiff.**

In November 2013 KAMU contracted with HMS to create virtual private network between KAMU's 11 health clinic members and HMS, to ultimately permit electronic health records (EHR) to be shared by those clinics and KAMU.  The networks would be HIPPA-compliant, and staff at the 11 clinics and KAMU would be trained to use the system.  The program was to "go live" in March 2014, and for two years thereafter HMS

would store the EHR data.  KAMU paid HMS upfront fees in the amount of $194,000.00.

KAMU twice extended the deadline for HMS to perform.  HMS needed until August 2015, 18 months after the "go live" date to complete the project for just one clinic To date only EHR from one clinic has been has been extracted.  KAMU cancelled the contract in December 2015, provided HMS written notice of the breach of the contract and demanded mediation, a pre-requisite to arbitration or litigation, commence.

In late July 2016, Dudley Smith conducted a full-day mediation session. Negotiations collapsed at 4:00 p.m. that afternoon, when HMS representatives advised they lacked settlement authority.

HMS does not deny failure to honor its contractual promises, or that it received $194,000.00 from KAMU.  HMS argues KAMU failed its duty to grant HMS access to the respective clinics' software programs, thus making it impossible for HMS to complete its contractual promises.  The Agreement HMS drafted does not require KAMU to secure such access to the software programs.  Further, KAMU learned from Ahmad Jabr's email that HMS representatives knew before signing the Agreement that they would most likely have difficulty gaining access, because the software programs at the clinics would be subject to licenses.  HMS dealt with that issue in prior agreements and failed to advise KAMU.

Further, HMS provided not only an unrealistic time frame to complete its work (5 months) and did hardly anything for over a year to fulfill the contract.  In the face of HMS's failure to perform or mediate in good faith, KAMU was forced to contract

3

another vendor to perform the same and additional purposes of the HMS agreement.

      **b.**        **Contentions of Defendant.**

On November 22, 2013, the Kansas Association for the Medically Underserved ("KAMU") and Heath Metric Systems ("HMS") entered into a written contract for "Software Subscription Services" ("Contract").   Pursuant to the Contract, HMS was to establish a software network system consisting of virtual private network ("VPN") connections between HMS' HIPAA-compliant cloud and 11 Kansas health clinics associated with KAMU.  After installation, HMS was to process weekly data pulls from the Electronic Health Record ("EHR") systems of each of the 11 clinics for the management of patient information.

HMS' job was to translate the data from each clinic – each using a different EHR into a common format. This is HMS' core competency and HMS offered an innovative and efficient manner to circumvent expensive "interfaces" that the EHR vendors often add if their clients want to get useful reports out of their own data.  When the Contract was entered into, all HMS needed was a username and password to access the database of the clinics' EHR, something that all its clients – including KAMU – had to have to allow HMS to install its technology, and KAMU guaranteed it would provide HMS access to all clinics in this manner.

### Attempting Installation

In early 2014, HMS immediately started the installation process, creating and outfitting the 11 virtual machines that would serve each clinic and installing the

connection to the virtual machine that would house the Registry for KAMU.  HMS also initiated the process that would connect these machines to the network of each clinic and then to the database from which HMS would "harvest" the data.  These two steps are called "Establishing Virtual Private Network (aka VPN Access) Connection" to the network where the client's database resides and "Establishing Standard Query Language ("SQL") Access to the EHR Database (aka SQL Access).  It was here that HMS began to run into problems.  HMS was told to work with a project coordinator assigned by KAMU who managed all communications with the clinics and was to facilitate the process, including getting access permissions.

HMS encountered one impediment or another with each clinic HMS attempted to install, and these were reported to the KAMU coordinator, who was attempting her best to assist; in fact, there had been weekly calls with HMS' former COO to address these issues. The impediments fell into two categories:

• **Refusal of Access Delays** – Many of the workers in the individual clinics who were to allow VPN and SQL Access to HMS were either unaware of this project or had not received formal approval from their chain of command.  Note that sometimes these workers were themselves contractors to these clinics and have significant requirements under HIPAA to require that the clinics themselves authorize any access – something that was to be coordinated by KAMU.  Often, HMS' engineers would set aside a block of time for the installation – which is done remotely while on a conference call with the client – and spend the time explaining to the client who HMS was and its relationship via

5

KAMU, whose coordinator was often on the call but sometimes not known to the clinic worker or contractor.  This category of impediments caused significant delays and costs, but the clarifications were eventually made and the workers were prepared to proceed.

• **Unavailability of SQL Access** – This more serious impediment started manifesting as soon as HMS cleared the first hurdle in the first clinic and continued to manifest across others.   When the clinic workers were asked to provide a "port connection", a username and a password to HMS to allow access, HMS was told that the clinic did not have such access.   There were several types of reasons given, but all workers informed HMS that KAMU should have known of their circumstances regarding availability of SQL Access.  Three categories are worth mentioning:

• Clinics whose EHR did not offer SQL access at all – these EHR vendors require clinics to pay exorbitant fees for an "interface" to their own data and the clinics had opted not to purchase that, for obvious reasons.

• Clinics whose EHR did offer the SQL Access, but whose Information Technology leadership had not been consulted regarding the KAMU project and were now either refusing connection or delaying it until they studied the request from KAMU.

• Clinics whose EHR offered other manual access to reports, via the "Front End", that can be accessed by a user that logs on to the EHR application itself. This is not a SQL Access as required by the Contract.

6

### Attempting to Remedy the Situation

HMS spent a minimum of three times the amount of total effort HMS would normally spend on an installation – all due to trying to resolve a permissions matter that KAMU should have anticipated.  Yet, HMS worked hard with the KAMU coordinators and a contractor that was asked to manage the project for KAMU to think of a way to precede.  HMS is a small Company with a growing presence in Kansas City and Kansas. HMS takes pride in offering an innovative solution at a very affordable price for a problem that plagues healthcare today, and HMS wanted to retain the business of safety-net clinics that exemplify the need.

HMS had spent considerable cost in getting this far in the process, so HMS sought to explore another way of helping.  During this same year (2014 calendar year), HMS developed technology that assists small practices further by permitting the retrieval of data from EHR products legally and without the need for SQL Access.  HMS did so because of its growing awareness of the devious technique being employed by certain EHR vendors to extract further fees from their clients.  HMS had begun to use this technology with other clients and HMS decided to offer it to KAMU.

### HMS' Proposal

Because all EHRs in KAMU's member clinics had "Front End" access (the ability to log in to the EHR product itself), HMS offered to connect all clinics using this new technology.   Although this technique is costlier, HMS said it would honor the same terms of the Contract and at no additional cost to KAMU.  HMS also offered to honor the

7

entire rental for the first year and only start counting the rental fees after each clinic was installed using the new method.  HMS presented this to the coordinator, as well as to the prior leadership of KAMU towards the end of December 2014.

### KAMU Accepts HMS' Proposal

KAMU accepted HMS' proposal as evidenced by KAMU paying the remainder of the contractually owed amount of $17,530.00.   KAMU appeared excited about this method that would finally liberate its data, and HMS was set to proceed.  HMS' Board agreed that HMS would carry the two years' worth of rentals in the books and comp' them the rental fees once they were fully installed.

In January of 2015, HMS began working with Heart of Kansas ("HOK"), the clinic selected by the KAMU coordinator to be the "pilot" under this new method.  HMS discussed the pros and cons of going with more than one clinic, with the decision arrived at to start with the "best environment" and then move to the second and third clinic and then others -- and HOK was selected. (Salinas was to be the second.) It was clear that there remained some considerable issues for the other practices and using a "best practice"/"early adopter" approach appeared wise.

However, HMS encountered significant delays obtaining a username and password into the front end of the EHR to allow HMS' connection that would allow it to log on as a user.  Among the delays, for example, was the fact that HOK did not have enough user licenses to give one to HMS to use.  HMS began to use a license that became available when an employee was on vacation, but it was an awkward situation for a few

8

months.  Nevertheless, HMS completed the task and demonstrated to the HOK staff in August/September of 2015 that the connection was complete.

HMS conducted training at HOK and expected to move on quickly to the following clinic (Salinas), but instead there was silence from KAMU.  In October, HMS learned that a new CEO at KAMU wanted to talk about the Contract but without any indication that there was a problem.  In fact, a series of calls were arranged, one cancelled by KAMU, one cancelled by HMS due to scheduling conflicts – with the date finally set in late November 2014.  During the call, HMS CEO and Founder Tomas Moran recounted this same narrative to Denise Cyzman, KAMU's CEO (since October 2014) and repeated HMS' offer to complete the installation using its new state-of-the art technology.

HMS also informed KAMU of the significant progress that it had made in convincing the leadership in Kansas City and Kansas of the soundness of the technology and its approach, including the fact that HMS was being considered as vendors for both Kansas University Medical Center's Jayhawk medical group and for an extensive KUMC project throughout rural Kansas led by Dr. Bob Moser, formerly the head of Kansas Department of Health and Environment (both engagements have since closed and HMS was contracted for those two efforts).  HMS provided this information to reassure the new KAMU CEO of the depth of HMS.

**Litigation Begins**

Nevertheless, on December 9, 2015, KAMU's attorney Charles Engel sent HMS

CEO Tomas Moran a letter demanding a refund of $184,000.00.  Thereafter, the parties attempted to mediate their dispute but were unable to reach an agreement.  KAMU then filed suit.

Section 9.4 of the Contract provides as follows:

**9.4     LIMITATION OF LIABILITY**

IN NO EVENT SHALL EITHER PARTY'S LIABILITY TO THE OTHER ARISING OUT OR RELATING TO THIS AGREEMENT, WHETHER BASED ON CONTRACT, TORT OR OTHER LEGAL THEORY, EXCEED FOUR TIMES THE AMOUNT OF THE FEES PAID AND TO BE PAID BY Customer AND ITS AFFILIATES TO LICENSOR DURING THE 12 MONTH PERIOD PRIOR TO THE CLAIM.

Because KAMU only paid HMS $17,530.00 during the 12 months prior to its claim, HMS' liability in this matter is capped at $70,120.00 should KAMU prevail at trial.

**4.     LEGAL CLAIMS AND DEFENSES.**

**a.     Legal Claims of Plaintiff.**

Kansas Association for the Medically Underserved asserts that it is entitled to recover upon the following alternate theories:

1.     HMS breached its agreement with KAMU by failing to timely perform its promised services as negotiated and agreed in the Subscription Services Agreement HMS drafted.  (First Cause of Action in Complaint).

2.     HMS failed its duty of good faith inferred in all contracts by inducing KAMU in December 2014, to extend the deadline for HMS to perform the agreed upon

services using a "work around" it had developed  to eliminate issues with the clinics'

software license, if KAMU would pay HMS an additional $17,530.00.  KAMU paid the

funds but HMS still failed to deliver the promised EHR network. (Second Cause of

Action in Complaint.

       3.     HMS further failed its duty of good faith to mediate in July 2016, as

required by the agreement.  HMS violated the rules of the mediation by not sending

representatives with settlement authority in person or via telephone, causing undue

expense in preparation and participation by KAMU representatives, its counsel and the

mediator.  (Second Cause of Action in Complaint).

       4.     HMS defrauding KAMU by promising the EHR network would "go live"

within five months of executing the subscription agreement, despite HMS

representatives' knowledge it would encounter problems accessing the clinics' software

programs, which would complicate and delay implementation beyond April 2014.

Further, KAMU was promised in December 2014, if it paid HMS an additional $17,530,

it's "work around" would permit HMS to complete the Contract.  KAMU paid the funds,

but HMS failed to complete the contracted project.  HMS made promises they knew were

false or recklessly made, HMS knew it could not keep its promises when they were made

to induce KAMU to enter into the agreement and later spend additional fund.  KAMU

relied on HMS's promises and has suffered financial damages upon that reliance.  (Third

Cause of Action in Complaint).

      **b.**     **Defenses of Defendant.**

Health Metric Systems, Inc. asserts the following defenses:

1.      HMS denies it breached the Contract, denies it breached its duty of good faith and denies it defrauded KAMU.

2.      KAMU has failed to mitigate its alleged damages.

3.      KAMU failed to perform its duties under the Contract which prevented HMS from performing its duties under the Contract.

4.      KAMU's alleged damages were caused in whole or in part as a direct result of its own actions and conduct.

5.      KAMU's alleged damages were caused in whole or in part by other persons for whom HMS is not responsible.

6.      KAMU prevented HMS from performing its duties under the Contract by failing to provide HMS access to KAMU's clinics' databases/computer systems.

7.      HMS denies it breached the Contract with KAMU.

8.      HMS denies it caused or contributed to cause any of the damages claimed by KAMU.

**5.      DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

None.

**a.      Damages of Plaintiff.**

After crediting HMS for the one clinic whose data was extracted and the withdrawal of another clinic from the project, Plaintiff has lost $178,584 from HMS non-

12

performance of the Contract, has incurred legal fees and expenses in the amount of $42,373.59, and $400.00 in costs.

> **b.**     **KAMU's alleged Damages are capped.**

Section 9.4 of the Contract ("Limitation of Liability"), caps KAMU's alleged damages at $70,120.00 because KAMU only paid HMS $17,530.00 during the 12 months prior to its claim.

HMS denies KAMU is entitled to attorney fees and costs.  The Contract does not contain an attorney fee provision and KAMU is not entitled to recover its attorney fees under California or Kansas law.

**6.     AMENDMENTS TO PLEADINGS.**

> None.

**7.     DISCOVERY.**

Under the scheduling order and any amendments, all discovery was to have been completed by October 16, 2017.  Discovery is complete.

Unopposed discovery may continue after the deadline for completion of discovery so long as it does not delay the briefing of or ruling on dispositive motions or other pretrial preparations.  Although discovery may be conducted beyond the deadline for completion of discovery if all parties are in agreement to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

13

8.    **MOTIONS.**

     a.    **Pending Motions.**

        None.

     b.    **Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

        Defendant intends to file motions in limine.

No dispositive motions will be filed in this case.

     c.    **Motions Regarding Expert Testimony.**  Not applicable, i.e., the parties

have stipulated that no expert testimony will be used in this case.

9.    **TRIAL.**

     The trial docket setting, as established in the scheduling order and any

amendments, is **August 7, 2018, at 9:00 a.m., in Topeka, Kansas.**  This case will be

tried by the court sitting without a jury.  Trial is expected to take approximately two days.

The court will attempt to decide any timely filed dispositive motions approximately 60

days before trial.  If no dispositive motions are timely filed, or if the case remains at issue

after timely dispositive motions have been decided, then the trial judge will convene

another pretrial conference to discuss, among other things, the setting of deadlines for

filing final witness and exhibit disclosures, exchanging and marking trial exhibits,

designating deposition testimony for presentation at trial, motions *in limine*, proposed

instructions in jury trials, and proposed findings of fact and conclusions of law in bench

trials.

IT IS SO ORDERED.

Dated February 5, 2018, at Wichita, Kansas.

　S/ KENNETH  G. GALE　　
Kenneth G. Gale
U. S. Magistrate Judge